AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
By:     ROBERT WILLIAM YALEN
        DOMINIKA TARCZYNSKA
        JENNIFER A. JUDE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2722/2748/2663
Fax:  (212) 637-2686
robert.yalen@usdoj.gov
dominika.tarczynska@usdoj.gov
jennifer.jude@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR SALES, U.S.A., INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,<br><br>    Defendants. | No. 21 Civ. _____ (     )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff United States of America, by its attorney, Audrey Strauss, the Acting United States Attorney for the Southern District of New York, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

## NATURE OF THE ACTION

1.      For a decade, from approximately 2005 to at least late 2015, Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales U.S.A, Inc., and Toyota

Motor Engineering & Manufacturing North America, Inc. (collectively "Toyota") systematically violated Clean Air Act automobile defect reporting requirements designed to protect public health and the environment from harmful air pollutants.

2.      Clean Air Act regulations require manufacturers to notify EPA when twenty-five or more vehicles or engines in a given model year have the same defect in an emission control part or an element of design installed in order to comply with emission standards and other EPA regulations. They also require vehicle manufacturers to report to EPA when they perform a recall to correct defects in emission-related parts, and to update EPA on the progress of such recalls. These mandatory reporting requirements are central to the Clean Air Act's purpose of protecting human health and the environment from harmful air pollutants: They encourage manufacturers to investigate and voluntarily address defects that may result in excess emissions of harmful air pollutants, and they provide EPA information regarding emission-related defects to use in its oversight of manufacturers' compliance.

3.      Toyota systematically violated these reporting requirements over the course of a decade. It materially delayed filing hundreds of reports about approximately 78 emission-related defects. Some reports were filed as late as eight years after they were due and only when Toyota finally disclosed its years of noncompliance to EPA. Toyota's late filings related to potential defects in millions of vehicles.

4.      This was not an oversight by Toyota. During the relevant period, Toyota managers and staff in Japan knew that the company was no longer taking the necessary steps to determine whether it was aware of twenty-five instances of the same emission-related defect—the threshold requirement for filing an Emission Defect Information Report, or "EDIR." Rather than follow this legally required standard, Toyota decided to file EDIRs principally when it was independently

required to file distinct reports with California regulators under a less strict standard—a standard that EPA had rejected as too lenient when Toyota had previously proposed to rely on it for federal reporting.  Time and again, Toyota managers and staff in Japan identified the discrepancy between the company's procedures and the plain language of the federal requirements, but failed to bring Toyota into compliance.  Moreover, Toyota's American unit, responsible for actually submitting the reports to EPA, was well aware of red flags indicating Toyota's noncompliance, but shut its eyes to the problem.  As Toyota's key U.S.-based employee wrote in one email:  "As long as EPA is not asking about EDIR[s] then I do not want to change."

5.     A similar disregard for compliance is reflected in Toyota's routine failure to file two other types of defect reports: "Voluntary Emissions Recall Reports," or "VERRs," which notify EPA of the existence and technical details of a manufacturer's voluntary recall of emission-related parts, and "Quarterly Reports," which inform EPA of the progress of a recall campaign.  Toyota's American office had reason to doubt that the Japanese decision-makers were satisfying VERR filing requirements, yet it did not cause Toyota to address the problem.  And Toyota almost entirely failed to file Quarterly Reports during this period.  In fact, between approximately 2009 and 2015, the only time that Quarterly Reports were filed for Toyota vehicles was when another manufacturer—a joint venture partner—advised Toyota of the need to do so and filed the forms for Toyota, after which Toyota continued ignoring the requirement for all other defects.

6.     As a result of its conduct, Toyota deprived EPA of timely information regarding emission-related defects and recalls and avoided the early focus on emission-related defects contemplated by the regulations.  Toyota's reporting failures likely resulted in delayed or avoided performance of voluntary remedial actions, with Toyota obtaining a significant financial benefit,

pushing costs onto consumers, and lengthening the time that unrepaired vehicles with emission defects remained on the road.

7.     The United States brings this civil action pursuant to Sections 204 and 205 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7523 and 7524, to address Toyota's longstanding failure to maintain the emission defect reporting program required by the Clean Air Act and applicable regulations, for the imposition of civil penalties, and for injunctive relief.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this matter under Sections 203, 204 and 205 of the Act, 42 U.S.C. §§ 7523, 7524 and 7525, and under 28 U.S.C. §§ 1331, 1345 and 1355.

9.     This Court has personal jurisdiction over each defendant.

10.     Venue is proper in the Southern District of New York pursuant to Section 205 of the Act, 42 U.S.C. § 7524 and 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

11.     Plaintiff is the United States of America.  EPA is an agency of the United States of America.

12.     Defendant Toyota Motor Corporation ("Toyota Motor Corp." or "TMC") is a publicly held Japanese automotive manufacturer headquartered in Toyota City, Japan.  Assisted by its subsidiaries and affiliates worldwide, TMC designs, manufactures, assembles, and sells "Toyota" and "Lexus" brand vehicles, including vehicles sold in the Southern District of New York and including vehicles located in the Southern District of New York as to which Toyota failed to timely file mandatory defect reports as described herein.  Toyota is registered on the New

York Stock Exchange and maintains its American Depository Shares in the Southern District of New York.

13.     Defendant Toyota Motor North America, Inc. ("TMNA") is a subsidiary of TMC incorporated in California.  TMNA was headquartered in the Southern District of New York during most of the period relevant to this complaint, and continues to maintain a principal office in Manhattan.  TMNA operates as a holding company of sales and manufacturing subsidiaries of TMC in the United States, and is responsible, among other things, for government and regulatory affairs and environmental matters for Toyota's U.S. business.  TMNA, in combination with other defendants, causes and has caused the design, manufacture, assembly, and sale of "Toyota" and "Lexus" brand vehicles, including vehicles sold in the Southern District of New York and including vehicles located in the Southern District of New York as to which Toyota failed to timely file mandatory defect reports as described herein.  TMNA is a registered foreign business corporation with the New York State Department of State and has an authorized agent for accepting service of process in New York.

14.     Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") was a subsidiary of TMC during most of the period relevant to this complaint.  During that time, it was incorporated and maintained corporate offices in Kentucky.  TEMA was consolidated with TMNA in January 2017 and its operations thereafter continued as part of TMNA.  TEMA was responsible (and continues to be responsible as part of TMNA) for Toyota's engineering, design, research and development, and, and manufacturing activities in the United States and elsewhere, including vehicles sold in the Southern District of New York and including vehicles located in the Southern District of New York as to which Toyota failed to timely file mandatory defect reports.  TEMA's Toyota Technical Center provided (and continues to provide

as part of TMNA) certain defect reporting and other functions for Toyota vehicles throughout the United States, again including vehicles sold in the Southern District of New York and including vehicles located in the Southern District of New York as to which Toyota failed to timely file mandatory defect reports.

15.     Defendant Toyota Motor Sales, U.S.A, Inc. ("Toyota Motor Sales" or "TMS") is a subsidiary of TMC.  It is incorporated under the laws of Delaware and during most of the period relevant to this complaint had its principal place of business in California.  TMS provides sales and service functions for Toyota nationwide and elsewhere, including with respect to vehicles sold in the Southern District of New York and including vehicles located in the Southern District of New York as to which Toyota failed to timely file mandatory defect reports as described herein.  TMS also provides certain defect reporting and other functions for Toyota vehicles throughout the United States, again including vehicles sold in the Southern District of New York and vehicles located in the Southern District of New York as to which Toyota failed to timely file mandatory defect reports.  TMS is a registered foreign business corporation with the New York State Department of State and has an authorized agent for accepting service of process in New York.

16.     Each of the defendants is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), and a "manufacturer" within the meaning of Section 216(1) of the Act, 42 U.S.C. § 7550(1).

## BACKGROUND

**A.     The Clean Air Act and Emission Standards**

17.     Congress enacted the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, to protect and enhance the quality of the nation's air resources in order to promote the public health and welfare. Title II of the Act, as amended, and the regulations promulgated thereunder, protect human health and the environment by reducing emissions from mobile sources of air pollution, including motor vehicles.  42 U.S.C. §§ 7521 *et seq.*

18.     Motor vehicles emit, among other things, nitrogen oxides, hydrocarbon, sulfur dioxide, carbon monoxide, and particulate matter.  These and other pollutants emitted by motor vehicles can cause severe health problems, either directly or as a result of chemical reactions in the atmosphere.  For example, particulate matter is associated with various severe health conditions, such as aggravated asthma and decreased lung function.  Similarly, nitrogen oxides interact with other chemicals in the atmosphere to create ground-level ozone pollution (also known as "smog"), which can cause or exacerbate various respiratory health conditions such as chronic obstructive pulmonary disease.

19.     To limit this pollution and protect the public health, the Clean Air Act requires EPA to promulgate emission standards limiting the types and levels of pollutants that motor vehicles sold in the United States may emit.  42 U.S.C. § 7521; *see* 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10 (light-duty vehicle emission standards).  No manufacturer may sell motor vehicles in or into the United States unless the vehicles are designed to comply with emission standards and the manufacturer has obtained a "certificate of conformity" from EPA prior to sale.  42 U.S.C. §§ 7521, 7541(a)(1); 40 C.F.R. part 85, Appendix VIII.

**B.      Emission Defect Reporting**

20.      Even if properly designed and certified, vehicles may fail to perform as designed because of a defect.   The defect may be, for example, a design or manufacturing error, a malfunctioning part, or an error in the software controlling vehicle functions.   If the defect affects one of the many vehicle components designed to control emissions, the vehicle may, in actual use, emit more pollutants than the levels approved in its certificate of conformity and permitted by law.

21.      To encourage manufacturers to timely and appropriately respond to defects that may affect emissions, Clean Air Act regulations require manufacturers to file prompt reports notifying EPA of defective emission-related parts and of manufacturers' efforts to recall and repair vehicles with emission-related defects.   40 C.F.R. part 85, subpart T (emission defect reporting regulations); *see also* 42 U.S.C. § 7542(a) (requiring manufacturers to "maintain records, perform tests . . . make reports, and provide information the Administrator may reasonably require" regarding compliance with emission standards).   These defect reporting requirements are a "critical . . . compliance tool[]" for ensuring that passenger cars and trucks, in particular, continue to comply with federal emission standards after sale.   EPA, *Vehicle & Engine Compliance Activities, 2014-2017 Progress Report*, at 7.

22.      Specifically, a manufacturer must file an "Emission Defect Information Report," or "EDIR," whenever the manufacturer determines that a "specific emission-related defect exists in twenty-five or more vehicles or engines of the same model year."   40 C.F.R. § 85.1903(a).   The report is due within "fifteen working days after an emission-related defect is found to affect twenty-five vehicles or engines of the same model year."   40 C.F.R. § 85.1903(b).   An "emission-related defect" is defined as any "defect in design, materials, or workmanship" that occurs in (*i*) "a device, system, or assembly described in" the manufacturer's approved application for a

certificate of conformity that affects various emission-related parameters stated in the regulations or (*ii*) "one or more emission-related parts, components, systems, software or elements of design which must function properly to ensure continued compliance with emission standards." 40 C.F.R. § 85.1902(b).  An EDIR must contain a description of the defect, an estimate of the number of affected vehicles, an evaluation of the emissions impact of the defect, an indication of the manufacturer's intended further actions with respect to the defect (such as whether a recall is anticipated), and other information.  40 C.F.R. § 85.1903(c).

23.     An EDIR filing serves two key functions.  First, it encourages manufacturers to identify emission-related defects early and to promptly conduct voluntary recalls to remedy those defects that warrant action.[1]  It does this by "extend[ing] . . .  surveillance" of emission-related defects "to . . . the manufacturers themselves," 40 Fed. Reg. 18176, 18177 (Apr. 25, 1975), and by requiring them to report to EPA, upon identifying twenty-five instances of a specific defect in a model year, an "evaluation of the emissions impact of the defect" and "[a]n indication of any anticipated manufacturer follow-up," among other information, 40 C.F.R. § 85.1903(b)(5), (7). In requiring manufacturers to grapple with emission-related defects promptly and to disclose relevant information to EPA, the regulations put in place a process to prompt manufacturer-initiated recalls.  *See* 40 Fed. Reg. at 18177 (EPA intent "to encourage manufacturers to repair voluntarily emission-related defects which they discover and report to EPA"); *id.* at 18178 (intent to "encourage manufacturers to repair voluntarily emission-related defects which they determine to exist in vehicles or engines.").

---

[1] As used throughout this complaint (and in EPA's regulations), a "recall" includes any "repair, adjustment, or modification program . . . to remedy any emission-related defect for which direct notification of vehicle or engine owners has been provided," 40 C.F.R. § 85.1902(d), regardless of whether the manufacturer calls the program a "recall," "service action," "service campaign," "warranty extension," or some other term.

24. Second, EDIRs provide EPA with an early warning that a vehicle or engine class is at risk of failing to perform as described in the certificate of conformity and required by emission standards. This information, taken together with other indicia of vehicle defects, such as consumer complaints, may lead EPA to investigate a defect and, where appropriate, press the manufacturer to conduct a voluntary recall in cases where the manufacturer was not otherwise doing so. If the manufacturer refuses to recall the vehicles voluntarily, an EPA investigation may ultimately lead EPA to order a mandatory recall. 42 U.S.C. § 7541(c)(1) (providing that EPA may order a recall when it "determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, does not conform to" applicable regulations).

25. EPA publicly reports the number of EDIRs filed by each manufacturer. EPA's "compliance activity reports" containing this and related information are posted on EPA's website.

26. If a manufacturer conducts a recall to remedy an emission-related defect in twenty-five or more vehicles or engines, it must also file a Voluntary Emissions Recall Report, or "VERR" with EPA. This report is due within fifteen working days of when the manufacturer notifies vehicle owners of the recall. 40 C.F.R. § 85.1904(a). In the VERR, the manufacturer must describe the substance of the recall, including technical details about the proposed fix. *Id.*

27. EPA publicly reports the number of VERRs filed by each manufacturer.

28. Finally, once an emission-related recall is underway, a manufacturer must file reports describing the progress of the recall (including the percentage of vehicles actually fixed) after each of the subsequent six consecutive quarters ("Quarterly Reports") with EPA. 40 C.F.R. § 85.1904(b).

29. It is a violation of the Clean Air Act for a manufacturer to fail to file EDIRs, VERRs, or Quarterly Reports when required to do so. 42 U.S.C. § 7522(a)(2)(A); 42 U.S.C.

§ 7542(a).  It is also a violation for any person to cause a manufacturer to fail to make such filings. 42 U.S.C. § 7522(a).

**C.    Toyota**

30.    Toyota is one of the largest vehicle and engine manufacturers in the world, selling nearly 2.1 million cars and trucks in the United States in 2020 alone.  As of December 9, 2020, TMC's market capitalization was US $185.3 billion.

31.    The Toyota defendants named in this complaint were, at all times relevant to this action, engaged in a single enterprise, in the business of manufacturing new motor vehicles to be sold in the United States, including the Southern District of New York, and elsewhere, and in the importation, sale, and distribution of such vehicles to and in the United States, including the Southern District of New York, and elsewhere.

32.    Toyota's decision-making is highly centralized, with the Japanese parent company, Toyota Motor Corp., making critical decisions for its affiliates and subsidiaries, including with respect to compliance with emission-defect reporting requirements.

33.    Toyota cultivates a public perception of "quality" and "environmental friendliness" of its vehicles through marketing, statements in public filings, and Toyota's website, among other things.

34.    The United States has previously brought two major enforcement actions against Toyota on subject matters related to this complaint.  First, in 1999, the United States on behalf of EPA brought a civil action against Toyota in the United States District Court for the District of Columbia, seeking injunctive relief and civil penalties from Toyota Motor Corp., Toyota Motor Sales, and the Toyota Technical Center (now part of TEMA) for selling 2.2 million cars with noncompliant "on-board diagnostic systems," a key emission control system.  *United States v.*

*Toyota Motor Corp.*, 99-cv-1888 (RWR) (DAR) (D.D.C filed Nov. 22, 1999). This lawsuit was ultimately resolved in a 2003 consent decree, committing Toyota to injunctive relief, a $20 million "supplemental environmental project," and a civil penalty. *Id.*, Dkt. Entry 69. This consent decree was not terminated until March 2014.

35.     Also in March 2014, the United States charged Toyota in the U.S. District Court for the Southern District of New York with criminal wire fraud in connection with certain automobile safety recalls. *United States v. Toyota*, No. 14 Cr. 186 (WHP), Dkt. Entry 2 (Information). The prosecution "concern[ed] Toyota's concealment of, and failure to disclose, two safety-related issues causing unintended acceleration in its vehicles." *Id.*, Dkt. Entry 21 (Opinion & Order), at 4. To resolve the criminal matter, Toyota entered into a Deferred Prosecution Agreement ("DPA") and agreed to a Statement of Facts. The Court described the admitted facts as "present[ing] a reprehensible picture of corporate misconduct." *Id.* (internal quotation marks omitted). Pursuant to the DPA, Toyota paid a $1.2 billion fine and agreed to the appointment of a monitor for the term of the DPA. In 2017, the DPA expired and the Court entered an order of *nolle prosequi*, dismissing the information.

## TOYOTA'S VIOLATIONS

36.     For at least a decade—from approximately 2005 until at least late 2015—Toyota failed to timely disclose emission-related defects and recall information to EPA. In many cases, required disclosures regarding specific emission-related defects known to Toyota were not filed *at all* during this period. In other cases, Toyota did file reports during this period, but did so materially late.

37.     This conduct occurred while Toyota was already subject to a consent decree for Clean Air Act violations, and it continued while Toyota was subject to the DPA for concealment and non-disclosure of safety issues ultimately requiring a recall.

38.     Toyota personnel, including managers, knew or should have known about the company's noncompliance with defect reporting regulations, but allowed this conduct to continue unabated for a decade.   More generally, Toyota entirely failed to take seriously this important environmental compliance function, lacking basic management, operational, and oversight structures necessary to ensure compliance.

**D.     Toyota's Defect Reporting Departments**

39.     At least through late 2015, Toyota divided responsibility for emission defect filings among three distinct offices.  The Japan-based Quality Audit Department of Toyota Motors Corp. (the "Audit Department") was assigned responsibility for determining whether and when EDIRs and VERRs needed to be filed.  It was also charged with drafting these filings.  But Toyota failed to provide the Audit Department adequate training, resources, and oversight to ensure that Toyota complied with its reporting obligations.  The assigned Audit Department personnel often had a weak understanding of EPA regulations and weak English language skills.  Toyota management did not conduct internal reviews to determine whether EDIR or VERR filings were being prepared as required by law.

40.     Once the Audit Department determined that an EDIR or VERR should be filed, it would send a draft filing to a second Toyota office, TEMA's Ann Arbor, Michigan-based Toyota Technical Center ("Technical Center").  The Technical Center was Toyota's principal point of contact with EPA and was charged with editing the Audit Department drafts and filing them.  The Technical Center employee principally responsible for this process was not provided access to

adequate information to ensure that Toyota complied with its reporting obligations to EPA.  Toyota did not provide adequate training, resources, and oversight to ensure that this office properly performed its defect reporting responsibilities.

41.     Finally, a third office, within Toyota Motor Sales and located at the time in Torrance, California, was responsible for filing Quarterly Reports with EPA after an emission-related recall was commenced.  That office's personnel were untrained and unsupervised with respect to emission-defect reporting, and were allowed to remain untrained and unsupervised even after problems became known to Toyota management.

**E.     Toyota Presented an EDIR Compliance Process to EPA and then Stopped Following It Without Informing EPA**

42.     In 2002, Toyota met with EPA's Office of Transportation and Air Quality ("OTAQ") and Office of Enforcement and Compliance Assurance ("OECA") to describe Toyota's approach to complying with EPA's EDIR regulations.  Toyota's team included a manager from the Audit Department who traveled from Japan for the meetings, as well as Technical Center employees and managers based in Ann Arbor.

43.     At an initial meeting in March 2002, Toyota described its EDIR process as relying, in significant part, on filing EDIRs when Toyota was otherwise making a separate filing with California state authorities.  That California filing was due after Toyota received warranty claims for an emission-related part in 4% of Toyota's California fleet.  Although EPA advised Toyota that it agreed that warranty claims should be considered in making the decision whether twenty-five emission-related defects existed, EPA rejected Toyota's process as not considering warranty claims earlier enough in the process.

44.     At a follow up meeting in May 2002, Toyota presented a new process, which it described internally as an "enhancement" to its then existing EDIR process. Pursuant to this

proposal, Toyota represented to EPA that Toyota would investigate whether there were twenty-five instances of an emission-related defect (the trigger for filing an EDIR) under three scenarios: (*i*) when Toyota received unscreened warranty claims for an emission-related part in 1% of the relevant vehicles nationwide, (*ii*) when Toyota received 500 such unscreened warranty claims, regardless of percentage, or (*iii*) when TMS issued to TMC twenty-five or more reports, known as "early warning reports," regarding defects in an emission-related part. If its investigation showed that it had twenty-five of the same defect, Toyota would file as required. Toyota was aware (and noted internally) that this process would be "more stringent" and "stricter" than a separate reporting process that Toyota was required to comply with under California regulations.

45. The process presented by Toyota is reflected in the following flow chart submitted by Toyota to EPA in 2002:



46.     Toyota reiterated to EPA that these were its procedures in 2003, 2004, and 2005, attaching the same flow chart in submissions made by Technical Center managers to EPA in connection with its annual vehicle certifications.

47.     But, in approximately 2005, Toyota's Audit Department stopped following the process that Toyota had told EPA it would follow.  In fact, the Audit Department entirely stopped trying to determine if there had been twenty-five instances of the same defect, or indeed making any other independent assessment of whether an EDIR was required.

48.     Instead, Toyota began filing EDIRs principally as an afterthought when it was otherwise making the same California filing that EPA had rejected as insufficient at the March 2002 meeting.  Because this filing was not due until Toyota had received unscreened warranty claims for a particular emission-related part amounting to 4% of the vehicles in an engine family for that model year in operation in California,, even assuming that Toyota timely made its California filings, the California standard was significantly more generous to Toyota than the twenty-five defect trigger for filing an EDIR under federal regulations.  After it abandoned the federal standard, Toyota made fewer and later filings to EPA.

49.     Toyota also filed EDIRs in some instances where it was otherwise filing a VERR with EPA.  As noted above, VERR filings are required when a manufacturer conducts a recall on an emission-related part in twenty-five or more vehicles or engines, which could be well after the date the EDIR should have been filed.  Also, on a handful of occasions, Toyota filed EDIRs in response to external triggers, such as a telephone call from EPA expressing concern about consumer complaints related to a particular defect.  But Toyota had ceased performing any independent screening or assessment of whether twenty-five instances of a defect existed necessitating the filing of an EDIR and potentially requiring a recall.

50.     Toyota did not inform EPA that it had abandoned the process that it had told EPA it would follow.  Nor did it advise EPA that Toyota had entirely stopped determining whether twenty-five instances of the same defect existed.

**F.     Knowledge of Noncompliance Within Toyota**

51.     Over the ten years that followed, Toyota personnel time and again learned of Toyota's noncompliance or observed red flags, but took no action.  And over that same period, Toyota repeatedly failed to notify EPA of defects.

17

52.     In the Audit Department, multiple managers and employees through the years realized that Toyota's process was inconsistent with the plain language of EPA's regulations.

53.     For example, in 2009, the assistant manager who had been responsible for preparing EDIRs ("Assistant Manager 1")—and who was not considering whether twenty-five defects existed—was assigned a new supervisor, a "group manager."  The group manager reviewed the regulations and saw that they required Toyota to file an EDIR when it identified twenty-five of the same emission-related defect.  He also knew that Toyota was not applying the twenty-five defect standard.  He raised this discrepancy with Assistant Manager 1, who did not deny the discrepancy but instead simply informed the group manager that applying the California 4% standard was Toyota's standard practice.  The group manager failed to take any action to correct this.  Although he now claims that he "assumed" that this approach "must have been approved by EPA"—because that was how Toyota conducts business—he admits that he was not told that EPA had been informed of, let alone had approved, this process.  And, in fact, Toyota had not disclosed its noncompliant practices to EPA.

54.     In 2011, Assistant Manager 1 was replaced by a new assistant manager, who likewise noticed that the process he was told to follow did not comply with the text of EPA's regulation.  He questioned his predecessor, Assistant Manager 1, about the discrepancy, but was told that this was how things were done in the past and that the regulators had not complained about it.  Dissatisfied with this response, the new assistant manager than raised the issue with his supervisor, the group manager who had previously noticed the discrepancy himself.  The group manager responded that the new assistant manager should continue to use the California 4% standard because "EPA has not complained" about Toyota's practice—a practice that had not been disclosed to EPA.

55.     In 2014, a third assistant manager was given responsibility for Toyota's emission-related defect reporting process.  He too noticed the discrepancy, but was told by his predecessor that using the California standard was "Toyota's practice."  He accepted this explanation without further inquiry.

56.     In 2015, a new Audit Department group manager took over.  This new group manager had been responsible earlier in his career for counting internal Toyota reports to determine whether there were twenty-five instances of a single defect, so he knew the correct standard from personal experience.  He soon learned that Toyota was no longer taking steps to determine whether there were twenty-five instances of a single defect, and was not using that standard as the trigger for filing an EDIR.  He chose to let the issue go, however, satisfied with the assumption that "things had changed."

57.     As described above, after the Audit Department made the decision to file a defect report, and prepared a draft, it was the responsibility of American employees at the Toyota Technical Center to edit and file the reports.  In particular, for the period relevant to this complaint, one employee based in Ann Arbor, Michigan ("Technical Center Employee 1") was the Technical Center's—and therefore Toyota's—key point of contact with EPA for emission-defect filings.  He knew the EDIR regulations well and, indeed, had participated in the May 2002 meeting in which Toyota described its process for assessing whether twenty-five instances of a single defect existed.  And he, at best, had doubts that the Audit Department was complying with EPA regulations.

58.     This suspicion, for example, is reflected in an internal Toyota email from June 2010.  At that time, EPA had received complaints from Toyota customers who could not afford the repair cost of a defect in the 2007 Tundra air control valve.  EPA reached out to the Technical Center to ask why Toyota had not yet filed an EDIR with respect to the defect.  Technical Center

Employee 1 forwarded EPA's question to the Audit Department, copying Technical Center and Audit Department managers, and adding the comment: "I am still very concerned that we seemed to not have submitted a[n] [E]DIR several months ago when this problem apparently was known. *We are very concerned that EPA will now investigate Toyota for other possible matters that require a[n] [E]DIR*." (emphasis added). Technical Center Employee 1 attached a report with his email to the Audit Department that showed 2,568 warranty claims for the unreported defect.

59.    The next month, Technical Center Employee 1 again wrote to the Audit Department alerting it that a valve spring issue on Lexus engines had been in the news in the United States and that an EDIR was necessary because EPA might ask questions as to why one had not been prepared. He warned that "Manufacturers who fail to submit [E]DIR in a timely manner may be subject to large fines by the government."

60.    Later in 2010, Technical Center Employee 1 again had to ask the Audit Department why an EDIR had not been filed for yet another defect, relating to gas caps for 2002 Camry vehicles. Again, this defect had only come to Technical Center Employee 1's attention because a consumer complaint had led to a question from EPA, rather than pursuant to Toyota's internal processes.

61.    His warnings about possible fines for failure to file EDIRs continued. For example, in March 2012, Technical Center Employee 1 explained to the Audit Department: "An EDIR is a kind of red flag to the agency that we have a concern with a component. If they have a question after they receive it they will ask for additional information. If we don't submit one we can be fined."

62.    Again the following year, in 2013, he warned the Audit Department staff, copying his managers and the Audit Department group manager, about the legal risk of noncompliance:

"Failure to submit the EDIR and VERR can result in action by [EPA's Office of Enforcement and Compliance Assurance].  I believe VW received significant penalties for failure to submit EDIR and VERRs when required."

63.     In 2014, Technical Center Employee 1 again emailed on this subject.  Another manufacturer that was Toyota's partner in a joint venture had requested information about Toyota's procedure for counting emission-related defects to determine whether twenty-five of the same defect existed, requiring an EDIR filing.  In response to this request for information about Toyota's process, Technical Center Employee 1 wrote an internal email to the Audit Department, again copying his own managers and Audit Department managers:

> I do not know the exact process for initiating EDIR at [the Audit Department] but if I did I would not share it with [the joint venture partner car manufacturer].  I believe that each manufacturer has different method for determining when to issue EDIR. *As long as EPA is not asking about EDIR then I do not want to change.*

(emphasis added).

64.     Between 2005 and late 2015, Toyota's systematic failure to comply with EPA's EDIR regulations resulted in Toyota filing materially late approximately seventy-eight EDIRs.  These EDIRs pertained to millions of vehicles with the potential to exhibit emission-related defects.  As to eighteen of these, Toyota has determined that the defect in question could have caused vehicles to violate federal emissions standards.

**G.     Toyota's Failure to File VERRs**

65.     Toyota's disregard for the Clean Air Act's reporting requirements extended beyond EDIRs.  During approximately the same time period, Toyota routinely failed to file VERRs for recalls, which are defined broadly in the regulations to include any "repair, adjustment, or modification program voluntarily initiated and conducted by a manufacturer to remedy any

emission-related defect for which direct notification of vehicle or engine owners has been provided." 40 C.F.R. § 85.1902(d). Toyota failed to file approximately twenty required VERRs during this period.

66.     Audit Department personnel charged with determining when to file a VERR lacked the training and resources, and in some cases the English language skills, to competently perform their jobs. Technical Center Employee 1 was well aware of this, and had to repeatedly remind Audit Department employees over the years of the requirements and the need for compliance.

67.     A 2003 email from an Audit Department project manager to a Japanese employee stationed in America at the Technical Center, copying Toyota managers, reflects an intention to avoid EPA scrutiny by limiting VERR filings where possible. The Audit Department employee asked whether Toyota could avoid notifying EPA of an extended warranty for a defective emission-related part. As he explained, "We are a little concerned that this communication [about the new warranty extension] would 'wake the sleeping dogs.'" Years later, the Audit Department was still resisting filing VERRs for extended warranties and Technical Center Employee 1 had to warn the Audit Department that the "failure to submit a VERR on [a] matter of this nature can result in punitive action by the EPA's Office of Enforcement and Compliance Assistance (OECA)."

**H.      Toyota's Failure to File Quarterly Reports**

68.      During this same decade, Toyota also almost entirely failed to file required Quarterly Reports.  Indeed, from approximately 2009 until 2015, Quarterly Reports were filed for Toyota vehicles for only *one* recall, when a joint venture partner of Toyota filed Quarterly Reports for Toyota, even though Toyota had conducted numerous recalls requiring Quarterly Reports during this period.

69.      The Toyota Motor Sales office responsible for filing these reports was based in California at the time, and separate from the Audit Department decision-makers (located in Japan) and Technical Center personnel (located in Michigan) involved in filing EDIRs and VERRs. Toyota failed to provide these TMS employees with adequate training, resources, and oversight to ensure that Toyota complied with its reporting obligations to EPA.

70.      Toyota's management and training in this regard was so inadequate that the TMS employee purportedly responsible for preparing Quarterly Reports for most of the relevant period ("TMS Employee 1") was completely unaware that he had those responsibilities.  Although he was sent copies of VERRs—presumably so that he could then prepare the mandatory Quarterly Reports after each of the following six quarters, as required by regulation—he claims he thought his job was simply to file copies of the VERRs in TMS's files, not to take any action on them.

71.      In 2013, a joint venture partner alerted Toyota to the necessity of submitting Quarterly Reports for a voluntary recall related to the vehicles produced in this joint venture.  TMS Employee 1 asked an employee of this other manufacturer for help figuring out how to file Quarterly Reports, because Toyota had not filed a Quarterly Report in many years.  TMS Employee 1 likewise emailed Technical Center Employee 1 for assistance, similarly noting that Toyota had not filed a Quarterly Report for years.  Yet, Toyota had in fact conducted numerous

recalls of emission-related parts during this period, and should have been filing Quarterly Reports on a regular basis.

72.     The 2013 incident was reported to Audit Department management in Japan, to TMS, and to Technical Center Employee 1.  But despite Toyota management's awareness that TMS Employee 1 was unaware of the compliance task he had been assigned—and despite the fact that TMS Employee 1 finally had learned about this responsibility in 2013—nothing changed. Toyota did not start filing Quarterly Reports after this incident, nor did it submit previously due reports that had been omitted.

I.     **Toyota's Decade of Noncompliance Is Revealed**

73.     On September 24, 2015, Toyota revealed to EPA that it had determined that it had failed to comply with emission defect filing regulations, and the following day it disclosed that fact to the U.S. Attorney's Office for the Southern District of New York.  These disclosures came only after, on September 23, 2015, the U.S Attorney's Office had inquired whether Toyota had any "emissions discrepancies" to report.

74.     As part of its disclosures, Toyota filed thirty-nine late EDIRs, twenty late VERRs and numerous late Quarterly Reports in the fall of 2015 and continuing into 2016.  The filings related to emission-related defects on Toyota vehicles for the 2004 through 2014 model year. These filings were materially—often years—late.  Some EDIRs were filed eight years or more after they were required, well beyond when they were likely to be useful to EPA.

75.      Toyota did not disclose at that time that prior to the fall of 2015, Toyota had filed additional EDIRs materially late.  The Government's investigation has identified an additional thirty-nine such EDIRs.

**J.      Consequences**

76.     Toyota's violations likely had significant real world consequences.  By failing to timely prepare and submit EDIRs, VERRs, and Quarterly Reports, Toyota avoided performing the self-scrutiny of emission defects intended by the regulations as part of the defect reporting process and deprived EPA of information needed for oversight of Clean Air Act compliance.

77.     Among other things, by failing to file timely EDIRs, Toyota likely delayed or avoided repairing vehicles with emission-related defects, obtaining a significant financial benefit through the deferral and avoidance of recall costs, pushing costs onto consumers, and lengthening the time that unrepaired vehicles with emission-related defects remained on the road.

## FIRST CAUSE OF ACTION

78.     Paragraphs 1 through 77 are re-alleged and incorporated herein by reference.

79.     Section 208 of the Act, 42 U.S.C. § 7542, requires all manufacturers of new motor vehicles to make reports and provide information reasonably required by EPA in connection with Subchapter II, Part A of the Act, which deals with motor vehicle emissions.

80.     Section 203(a)(2) of the Act, 42 U.S.C. § 7522(a)(2), prohibits any person from failing to submit a report required under Section 208 of the Act.

81.     The EDIRs required to be filed by 40 C.F.R. part 85, subpart T, are reports that are required to be submitted pursuant to Section 208 of the Act.

82.     Toyota failed to timely file EDIRs in violation of Section 203(a)(2) of the Act.

83.     Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), Toyota is liable for civil penalties for each separate violation of Section 203(a)(2) of the Act and for each and every day such separate violation continued.

84.     Pursuant to Section 204(a) of the Act, 42 U.S.C. § 7523, the United States is entitled to injunctive relief to prevent future violations of EDIR regulations, and to mitigate past violations.

## SECOND CAUSE OF ACTION

85.     Paragraphs 1 through 84 are re-alleged and incorporated herein by reference.

86.     The VERR reports required to be filed by 40 C.F.R. part 85, subpart T, are reports that are required to be submitted pursuant to Section 208 of the Act.

87.     Toyota failed to timely file VERRs, in violation of Section 203(a)(2) of the Act.

88.     Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), Toyota is liable for civil penalties for each separate violation of Section 203(a)(2) of the Act and for each and every day such separate violation continued.

89.      Pursuant to Section 204(a) of the Act, 42 U.S.C. § 7523, the United States is entitled to injunctive relief to prevent future violations of VERR regulations, and to mitigate past violations.

## THIRD CAUSE OF ACTION

90.     Paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

91.     The Quarterly Reports required to be filed by 40 C.F.R. part 85, subpart T, are reports that are required to be submitted pursuant to Section 208 of the Act.

92.     Toyota failed to timely file Quarterly Reports, in violation of Section 203(a)(2) of the Act.

93.     Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), Toyota is liable for civil penalties for each separate violation of Section 203(a)(2) of the Act and for each and every day such separate violation continued.

94.     Pursuant to Section 204(a) of the Act, 42 U.S.C. § 7523, the United States is entitled to injunctive relief preventing future violations of Quarterly Report regulations, and mitigating past violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court enter judgment against Toyota as follows:

(i)     Assessing civil penalties, pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), and the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, codified as amended at 40 C.F.R. Part 19, against Toyota for each violation of Section 203(a)(2)(A) of the Act of up to $32,500 per day per violation occurring between March 16, 2004, and January 12, 2009; up to $37,500 per day per violation occurring between January 13, 2009, and November 1, 2015; and up to $48,192 per day per violation occurring on or after November 2, 2015;

(ii)     Enjoining Toyota to comply in all respects with emission reporting requirements; and

(iii)   Ordering such further relief as the Court may deem just and proper;

Dated: January 14, 2021
        New York, New York

JEFFREY BOSSERT CLARK
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources
  Division

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
*Attorney for Plaintiff United States of America*

By:

ROBERT WILLIAM YALEN
DOMINIKA TARCZYNSKA
JENNIFER A. JUDE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2722/2748/2663
Fax: (212) 637-2686
robert.yalen@usdoj.gov
dominika.tarczynska@usdoj.gov
jennifer.jude@usdoj.gov

Of Counsel:

LAUREN TOZZI
Attorney-Adviser
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW, Washington, DC  20460